**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

JOHN HERZOG, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

FLUOR FEDERAL SERVICES, INC., a Foreign Profit Corporation, ATKINSON CONSULTING LLC, a Foreign Limited Liability Company, BJMC GLOBAL, LLC, a Foreign Limited Liability Company, IPARAMETRICS, LLC, a Foreign Limited Liability Company, EMERGENCY MANAGEMENT PARTNERS, LLC, a Foreign Limited Liability Company, NOVACES, L.L.C., a Foreign Limited Liability Company, and DOES 1-50, inclusive,

*Defendants*.

**CASE No.: 0:25-cv-61991-MD**

**CLASS ACTION**

**PLAINTIFF'S AMENDED ANTITRUST CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff JOHN HERZOG ("Plaintiff"), individually and on behalf of all those similarly situated, by and through his counsel, brings this Amended Class Action Complaint ("Complaint") against Defendants FLUOR FEDERAL SERVICES, INC. ("Fluor"), ATKINSON CONSULTING LLC ("Atkinson"), BJMC GLOBAL, LLC ("BJMC"), IPARAMETRICS, LLC ("iParametrics"), EMERGENCY MANAGEMENT PARTNERS, LLC ("EMP"), NOVACES, L.L.C. ("Novaces"), and DOES 1-50 (who collectively shall be referred to hereinafter as "Defendants"), on personal knowledge with respect to himself and his own acts, and on information and belief as to other matters, alleges as follows:

## I. NATURE OF ACTION

1. Plaintiff, on behalf of himself and as a class action on behalf of Defendants' subcontractors and/or employees to provide Federal Emergency Management Agency ("FEMA") Technical Assistance Contracting ("TAC") services under or in relation to (a) Fluor's prime contract with FEMA within Zone 1 of FEMA PA TAC IV (regions 1, 3, and 4) and/or (b) Fluor's prime contract with FEMA within the East Zone of FEMA PA TAC V (regions 3 and 4) from four years prior to the filing of the Complaint through the present (hereinafter, the "Class" or "Class Members"), seeks lost wage damages, plus treble damages, interest, and attorneys' fees and costs caused by Defendants' long-standing and illegal non-solicitation and anti-poach (i.e., agreements between Fluor and its FEMA PA TAC IV and/or PA TAC V approved subcontractors to not recruit, poach, or enter FEMA TAC services contracts with each other's FEMA TAC subcontractors and employees) and wage-fixing agreements (i.e., agreements between Fluor and its FEMA PA TAC IV and/or PA TAC V approved subcontractors to pre-determine and fix the hourly wage rates to be paid by Fluor to FEMA PA TAC IV and/or PA TAC V approved subcontractors for FEMA TAC services; Fluor FEMA PA TAC IV and/or PA TAC V approved subcontractors then offer fixed hourly wage rates to FEMA TAC subcontractors and employees on a take-it-or-leave-it basis) that had the intended and actual effect of significantly reducing Class Members' wages.

2. This illegal conspiracy among and between Defendants and other Fluor FEMA PA TAC IV and/or PA TAC V approved subcontractors to not recruit, poach, or enter FEMA TAC services contracts with one another's FEMA TAC subcontractors and/or employees in order to thereby suppress their wages, was not known to Plaintiff and the Class Members until, at the earliest, mid-2022 when Plaintiff attempted to move from Atkinson to another Fluor FEMA PA

TAC IV subcontractor, and numerous Defendants—including iParametrics, BJMC, EMP, and Novaces—all subsequently informed him that they were under a specific anti-poach mandate by Fluor and that they could not speak with him regarding potential FEMA TAC opportunities. Plaintiff became aware of Defendants' wage-fixing conspiracy: (a) based on his personal experience of Atkinson fixing his hourly wage rate at the time he received and completed a pre-deployment agreement in early-2023 and had discussions with Atkinson regarding the same, where Atkinson informed Plaintiff that the offered hourly pay rate was a standard, no negotiation rate offered on a take-it-or-leave-it basis, and (b) after subsequently learning from other Atkinson FEMA TAC subcontractors—through face to face conversations between May and June of 2023—that Atkinson also fixed their hourly rates as well with no bids or offers for their FEMA TAC subcontracts (i.e., through take-it-or-leave it offers).

3. In sum, Defendants engaged in *per se* violations of the Sherman Act and the Florida Antitrust Act of 1980 by entering into non-solicitation, anti-poaching, and wage-fixing agreements for the express purpose of depressing and/or reducing market-based wages for Class Members that are typically associated with the active recruitment of workers in a competitive industry, especially for a government contract, and the nature and necessary effect of Defendants' agreements are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. While protecting and enhancing their profits, Defendants, through their non-solicitation, anti-poaching, and wage-fixing agreements, robbed Class Members of millions of dollars of wages for which Plaintiff and the Class now seek relief.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject of this action pursuant to 15 U.S.C. § 4, as well as 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the

claims brought under the laws of the State of Florida pursuant to 28 U.S.C. § 1367(a), since the matters at the heart of the Florida Antitrust Act claims form part of the same case or controversy.

5. This Court has personal jurisdiction over Defendants because each transacts business in this judicial district, and substantial parts of the anti-competitive conspiracies at issue took place in whole or in part within Florida.

6. Venue as to each Defendant is proper in this judicial district, pursuant to 15 U.S.C. §§ 22 and 28 U.S.C. §1391(b), because Defendants transact business and/or have transacted business during the relevant time period within the counties encompassed by the jurisdiction of the United States District Court for the Southern District of Florida. Defendants do sufficient business in this District to be subject to personal jurisdiction herein, because a substantial part of the acts giving rise to the claims occurred in this District. Broward County was a Federally declared disaster county for: Florida Hurricane Ian (DR-4673-FL); Florida Hurricane Nicole (DR-4680-FL); and Florida Severe Storms, Tornadoes, and Flooding (DR-4709-FL). Disaster work was performed in Broward County; therefore, venue is proper in the Fort Lauderdale Division.

## III. THE PARTIES

7. Plaintiff, who at all relevant times was a resident of Florida, is a former FEMA TAC subcontractor of Defendant Atkinson through Plaintiff's single-member Florida limited liability company, Wild Tiger Enterprises, LLC. Plaintiff initially entered into a "Subcontract Pre-Deployment Agreement" with Atkinson on February 15, 2021 which included a "pre-agreed upon rate of $61–91 per hour." Plaintiff's March 30, 2023 "Subcontract Agreement for Services" with Atkinson acknowledged that Atkinson had entered into a contract with Fluor—the prime contractor with FEMA—to provide FEMA TAC services for which the specialized expertise of Plaintiff was requested. Specifically, Plaintiff was contracted by Atkinson as a site inspector for

Hurricane Ian (DR-4673-FL), and worked in Fort Myers, FL for approximately six weeks between May 19, 2023 – June 28, 2023, working approximately 50 hours per week. Plaintiff also performed work in Broward County, FL. Plaintiff's subcontract with Atkinson called for three six-month durations for a total of eighteen months. In late March of 2023—after Plaintiff and Atkinson had been in discussions for a few months regarding his deployment for Hurricane Ian and after Plaintiff had indicated to Atkinson that he was a senior-level site inspector based on his skills and experience—Atkinson offered Plaintiff a take-it-or-leave-it subcontract with a compensation schedule of $55 per hour for a mid-level site inspector position. At all times during his six-weeks of work with Atkinson in 2023, Plaintiff was paid $55 per hour. On information and belief, all other Class Members were paid on an hourly basis. As a result, Plaintiff was subject to and victimized by the non-solicitation, anti-poaching, and wage-fixing conspiracy between and among the Defendants, as alleged herein, resulting in him having lost wages. Even during periods of time within the relevant time period when Plaintiff was not actively engaged in work with Defendants under Fluor's prime FEMA contract (e.g., from February 15, 2021 when Plaintiff entered a Subcontract Pre-Deployment Agreement with Atkinson through mid-May 2023 when Plaintiff began Hurricane Ian site inspector work for Atkinson; and after June 28, 2023 when Plaintiff stopped his Hurricane Ian site inspector work for Atkinson), Plaintiff was still subject to and victimized by Defendants' non-solicitation and anti-poaching agreements, which restricted his ability to find employment opportunities.

8. Defendant Fluor is a Washington State corporation with its principal place of business located at 100 Fluor Daniel Drive, Greenville, SC 29607. Upon information and belief, Fluor is a wholly owned subsidiary of Fluor Corporation, which is an engineering and construction firm headquartered at 6700 Las Colinas Blvd., Irving, TX 75039. Fluor does business in Florida.

Upon information and belief, Fluor was awarded the prime contract for FEMA Public Assistance Technical Assistance Contract ("PA TAC") IV for Zone 1 (regions 1, 3, and 4) during the relevant time period, with an exclusive FEMA PA TAC contract for the following U.S. States or district: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, Delaware, Maryland, Pennsylvania, Virginia, District of Columbia, West Virginia, Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee. Upon information and belief, Fluor was also awarded the prime contract for FEMA PA TAC V for the East Zone (regions 3 and 4) during the relevant time period. After Fluor was awarded the two aforementioned prime contracts (i.e., PA TAC IV for Zone 1 (regions 1, 3, and 4) and FEMA PA TAC V for the East Zone (regions 3 and 4)), FEMA issued Task Order Proposal Requests ("TOPR"), a contract tool to manage each disaster. Fluor did not have to compete with other prime contractors for FEMA PA TAC work in those zones through the FEMA's Task Orders, but Fluor's subcontractors all compete head-to-head with each other to place personnel for each TOPR. All of Fluor's subcontractors under the two aforementioned prime contracts propose on the same scope of work, positions and classifications, level of experience, duration, and location. Further, upon information and belief, Fluor competes with its own subcontractors, including through TRS Staffing Solutions, which is wholly owned by Fluor and which supplied personnel for Fluor under its FEMA PA TAC IV and V prime contracts.

9. Defendant Atkinson is an Arizona limited liability company with its principal place of business located at 67 S Higley Road, Ste. 103-472, Gilbert, AZ 85296. Atkinson does business in Florida. Upon information and belief, Atkinson entered into a contract with Fluor to provide FEMA TAC services during the relevant time period, including within Zone 1 of Fluor's prime contract for FEMA PA TAC IV. On or around March 30, 2023, Atkinson entered into a

"Subcontract Agreement for Services" with Plaintiff for Plaintiff to provide FEMA TAC services. Upon information and belief, Atkinson's PA TAC IV services to Fluor are exclusive and constrained to Fluor, i.e., Atkinson could not participate on any other PA TAC IV prime contracts. Upon information and belief, Atkinson was restrained from providing disaster services to any other applicants or prime contractors for disaster services within Fluor's exclusive territory.

10. Defendant BJMC is a South Carolina limited liability company with its principal place of business located at 104 S Main St., Ste. 800, Greenville, SC 29601. BJMC does business in Florida. Upon information and belief, BJMC entered into a contract with Fluor to provide FEMA TAC services during the relevant time period, including within Zone 1 of Fluor's prime contract for FEMA PA TAC IV and within the East Zone of Fluor's prime contract for FEMA PA TAC V.

11. Defendant iParametrics is a Georgia limited liability company with its principal place of business located at 6515 Shiloh Rd., Ste. 200, Alpharetta, GA 30005. iParametrics does business in Florida. Upon information and belief, iParametrics entered into a contract with Fluor to provide FEMA TAC services during the relevant time period, including within Zone 1 of Fluor's prime contract for FEMA PA TAC IV.

12. Defendant EMP is a Virginia limited liability company with its principal place of business located at 1318 Autumn Breeze Dr., Oilville, VA 23129. EMP does business in Florida. Upon information and belief, EMP entered into a contract with Fluor to provide FEMA TAC services during the relevant time period, including within Zone 1 of Fluor's prime contract for FEMA PA TAC IV.

13. Defendant Novaces is a Louisiana limited liability company with its principal place of business located at 650 Poydras St., Ste. 2523, New Orleans, LA 70130. Novaces does business in Florida. Upon information and belief, Novaces entered into a contract with Fluor to provide

FEMA TAC services during the relevant time period, including within Zone 1 of Fluor's prime contract for FEMA PA TAC IV.

14. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 to 50, inclusive, are currently unknown to Plaintiff, who therefore sues Defendants by such fictitious names. Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants designated herein as a Doe is legally responsible in some manner for the unlawful acts referred to herein in that they are additional co-conspirators. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as Does when such identities become known. Defendants and the Does 1-50 shall collectively be referred to as "Defendants."

15. Plaintiff is informed and believes, and based thereon alleges, that each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant are legally attributable to the other Defendants. Furthermore, Defendants in all respects acted pursuant to the mutual non-solicitation, anti-poaching and wage-fixing agreements that were intended to suppress and had the effect of suppressing wages for the Class Members.

## IV. FACTS EVIDENCING THE CONSPIRACY

16. Defendants had and have an agreement to control their FEMA TAC subcontractors' and employees' wages and mobility by agreeing to not recruit or contract with each other's FEMA TAC subcontractors and employees.

17. The mutual non-solicitation and anti-poaching agreement itself constituted and constitutes a *per se* violation of the Sherman Antitrust Act and the Florida Antitrust Act between Defendants. This agreement was not only a bilateral agreement between Fluor and the other

Defendants; there was also a comprehensive and overarching agreement between all of the conspirators and among all of the Defendants to not solicit or poach one another's FEMA TAC subcontractors and/or employees. Even when Defendants' FEMA TAC subcontractors and/or employees were not actively engaged in FEMA service work for Defendants, they were still restricted from finding FEMA service work opportunities due to Defendants' non-solicitation and anti-poaching agreements simply because they were part of one of the Defendant's "rosters."

18. A February 16, 2021 email written by Geoffrey C. Brien, the Manager of Disaster Management Services for Defendant Novaces, constitutes strong evidence that Novaces and Defendants agreed to participate in the non-solicitation and anti-poaching agreements at issue that both constitute antitrust violations and illegally suppressed Class Members' wages. Specifically, as part of his email providing details and information as to applications for FEMA subcontractor positions with Novaces, Mr. Brien wrote that "If you are currently on another FLUOR Subcontractor's Roster, you cannot join the NOVACES – IEM Roster. Below is a list of Fluor Subcontractors…."[1] Mr. Brien's February 16, 2021 email further states that "By submitting your application to join the NOVACES FEMA PA-TAC Roster under Fluor, you must commit to cease negotiations with all existing FLUOR subcontractors. FLUOR will uncover [sic] you attempted to join 2 or more Rosters which violates FEMA guidelines." This email is powerful evidence that, as of at least 2021, Fluor and the other Defendants had agreed to participate in a mutual non-solicitation and anti-poaching agreement, seemingly under the guise that subcontracting with more than one Fluor FEMA contractor violates FEMA guidelines.

19. Upon information and belief, there is no FEMA policy or guideline that restricts the mobility of FEMA TAC subcontractors and/or employees from one FEMA PA TAC IV or V

---

[1] Included in Mr. Brien's "list of Fluor Subcontractors" are Atkinson, BJMC, iParametrics, and EMP, among several other entities.

approved subcontractor to another. Stated differently, FEMA does not restrict the movement of FEMA TAC subcontractors and/or employees within Fluor's team of FEMA PA TAC approved subcontractors, and any "guideline" that is being "violate[d]" by attempting to join the roster of a different FEMA PA TAC approved subcontractor under Fluor's prime contract with FEMA is actually the anticompetitive and illegal mandate by Fluor which coerces and enforces the non-solicitation, anti-poaching, and price fixing conspiracy that Defendants have agreed to.

20. Plaintiff first became aware of Defendants' non-solicitation and anti-poaching activity in 2022 when he attempted to move from Atkinson to another Fluor FEMA contractor due to Atkinson's low, take-it-or-leave-it rates and its unsatisfactory marketing of his skills and experience. Starting in 2022, Plaintiff began interviewing with other Defendants in an attempt to secure FEMA PA TAC opportunities.

21. Specifically, Plaintiff spoke with iParametrics Resource Manager Heidi Schuster in Summer 2022. During that conversation, Heidi Schuster asked Plaintiff what prime contractor for Public Assistance Plaintiff was on, and through which PA TAC IV approved subcontractor. After Plaintiff informed her that Fluor was his prime contractor and that his Fluor FEMA PA TAC IV approved subcontractor was Atkinson, Heidi Schuster informed Plaintiff that iParametrics could not discuss him coming on board because Fluor had an anti-poaching mandate preventing her from considering Plaintiff as a candidate. Similarly, in approximately September 2022, Plaintiff spoke with iParametrics Recruiter Carrie Schuster regarding an Individual Assistance ("IA") construction manager position. After discussions regarding this IA position, Carrie Schuster noted in Plaintiff's resume that he did Public Assistance work, which Plaintiff confirmed. After Plaintiff informed Carrie Schuster that he was on Atkinson's PA TAC roster, Carrie Schuster stated to Plaintiff, "Oh, we cannot talk to you." Plaintiff indicated to Carrie Schuster that he may want to

switch to iParametrics's roster, but Carrie Schuster responded by stating that she cannot speak with Plaintiff because Fluor has a rigid anti-poaching mandate and that Fluor has threatened punitive measures if its FEMA PA TAC approved subcontractors solicit or poach one another's FEMA TAC subcontractors.

22. In approximately February 2022 and again in November 2022, Plaintiff called BJMC President, Cole Cullen, to discuss PA TAC opportunities with BJMC. On both occasions, after learning that Plaintiff was already under Fluor's prime FEMA contract through his subcontract with Atkinson, Mr. Cullen informed Plaintiff via telephone that he could not talk to Plaintiff because Fluor has an anti-poaching mandate. During Plaintiff's February 2022 call with Mr. Cullen, Plaintiff informed Mr. Cullen that he does not want to be on Atkinson's team, but Mr. Cullen told him that it "doesn't matter" and that he cannot discuss opportunities with Plaintiff or consider him.

23. Sometime between approximately October and November 2022, Plaintiff sent his resume to Novaces's Manager of Disaster Management Services, Geoffrey C. Brien. Within the same time period, Plaintiff called Mr. Brien and spoke with him via telephone. At the outset of their call, Mr. Brien immediately asked Plaintiff if he was on any other Fluor FEMA PA TAC IV approved subcontractor's roster. When Plaintiff informed Mr. Brien that he was on Atkinson's roster, Mr. Brien told Plaintiff that he cannot be on two rosters at the same time. Plaintiff informed Mr. Brien that he is looking to change rosters and for a better opportunity, but Mr. Brien stated that Plaintiff cannot do that, that Fluor does not allow Novaces to hire PA TAC subcontractors from other Fluor FEMA PA TAC IV approved subcontractors, and that Fluor has a strict anti-poaching requirement and that Novaces does not want to risk its relationship with Fluor.

24. Plaintiff also spoke with a representative for EMP at some point during the relevant time period about FEMA PA TAC opportunities, and again was told that EMP cannot speak with Plaintiff since Fluor has an anti-poaching mandate and Plaintiff was already on Atkinson's PA TAC roster.

25. In 2022, Plaintiff spoke with Atkinson's Federal Program Manager, Melissa Everett, regarding FEMA's need for Community Resource Center ("CRC") Cost Estimators in Pennsylvania. During their conversation, Plaintiff asked Ms. Everett if she knows anything about an "anti-poaching" requirement with Fluor and if she is aware of whether it is true that he cannot switch contractors inside Fluor's prime FEMA PA TAC IV contract. In response, Ms. Everett confirmed Fluor's anti-poaching agreement by telling Plaintiff that Fluor has a rigid policy on poaching PA TAC subcontractors—which she explained is hiring a subcontractor from another Fluor FEMA PA TAC IV approved subcontractor—but that she did not know why. Ms. Everett confirmed that Fluor's anti-poaching mandate meant that Plaintiff could not move from Atkinson to another Fluor FEMA PA TAC IV approved subcontractor. Plaintiff continued to be on Atkinson's roster under his February 15, 2021 Subcontract Pre-Deployment Agreement.

26. Plaintiff signed the first and only comprehensive subcontract with Atkinson on March 30, 2023 for anticipated work in Florida for Hurricane Ian. At no time during Plaintiff's discussions with Atkinson prior to when Plaintiff signed the February 15, 2021 Subcontract Pre-Deployment Agreement did anyone with Atkinson advise Plaintiff that he was exclusively bound to Atkinson and/or Fluor or that he could not pursue employment or subcontract opportunities with other Fluor PA TAC IV approved subcontractors (especially not during periods of time when Plaintiff was only on Atkinson's roster but not engaged in FEMA subcontract services).

27. Plaintiff preformed on his subcontract with Atkinson until approximately June 28, 2023 when, on information and belief, a Fluor representative informed Plaintiff in person that his subcontract was being terminated and Plaintiff was required to return all FEMA-related work equipment that he had been issued.

28. On or about November 21, 2024—which was over a year after (a) Plaintiff's subcontract with Atkinson had been terminated and its contractual provisions had expired, and (b) Plaintiff had moved from Fluor as a prime contractor to a different prime contractor, CCPRS (a joint venture between CDM Smith and Jacobs Engineering)—Plaintiff attempted to explore FEMA PA TAC V opportunities in Florida or North Carolina with BJMC and had a third telephone conversation with BJMC's President, Cole Cullen. During that November 21, 2024 telephone conversation, Mr. Cullen stated to Plaintiff unequivocally that BJMC adheres to Fluor's mandate regarding an express anti-poaching for employees and independent subcontractors. Plaintiff informed Mr. Cullen that he had spent the past year contracted with FEMA prime contractor CCPRS in California in relation to a disaster, that any and all association with a previous Fluor PA TAC subcontractor (i.e., Atkinson) had terminated by the express terms of the contract, and that no further business interaction was going to be considered with Atkinson. Regardless, Mr. Cullen refused to communicate with Plaintiff regarding FEMA PA TAC V subcontract opportunities with BJMC and explicitly stated his reason for doing so was because of Fluor's anti-poaching mandate and that he was not willing to risk BJMC's relationship with Fluor by speaking with Plaintiff about FEMA PA TAC V opportunities. On November 25, 2024, Plaintiff mailed a letter to Mr. Cullen via USPS Certified Mail memorializing their November 21, 2024 conversation; Plaintiff did not receive a response from Mr. Cullen to his letter.

29. Plaintiff's March 30, 2023 Subcontract Agreement for Services with Atkinson also includes a "Non Poaching" agreement under which Plaintiff was prohibited for one year after the termination or expiration of the agreement from seeking to employ anyone employed by Atkinson and from having any connection with a person or entity with business "that is in any way competitive with or similar to" Atkinson within the same state in which services under the agreement were performed.

30. Regarding Defendants' wage-fixing conspiracy, Plaintiff initially spoke with Atkinson's Federal Program Manager, Melissa Everett, in or around early-2021 after Plaintiff found an Atkinson advertisement and sent Atkinson his resume. Plaintiff completed Atkinson's required paperwork, including signing a Subcontract Pre-Deployment Agreement with Atkinson on February 15, 2021 which included a "pre-agreed upon rate of $61–91 per hour." In late-March of 2023—after Plaintiff and Atkinson had been in discussions for a few months regarding his deployment for Hurricane Ian and approximately 15 days before Atkinson anticipated mobilizing its PA TAC IV subcontractors for work related to Hurricane Ian—Atkinson presented to Plaintiff a subcontract that included a compensation schedule of $55 per hour for a mid-level site inspector position and $70 per hour for a senior-level site inspector position. Plaintiff asked Ms. Everett if the compensation schedule was negotiable, and Ms. Everett informed him that the compensation schedule included standard, take-it-or-leave-it wage rates. Plaintiff indicated to Ms. Everett that he was definitely a senior-level site inspector based on his skills and experience, and Plaintiff believed he was going to be a senior-level site inspector based on his subcontract with Atkinson and his conversations with Ms. Everett between January and March of 2023. However, just before Plaintiff was mobilized for Hurricane Ian, in mid-May 2023, Atkinson informed Plaintiff he was being assigned to a mid-level site inspector position and his hourly wage rate was dictated and

unilaterally set by Atkinson at $55 per hour. Atkinson never asked Plaintiff for bids or offers for subcontract work as a site inspector, and Plaintiff was never able to negotiate his wage rate. Rather, Atkinson fixed Plaintiff's hourly rate on a take-it-or-leave-it basis with no opportunity for negotiations.

31. Between May and June of 2023, Plaintiff subsequently learned through face to face conversations with at least four other Atkinson FEMA TAC subcontractors that Atkinson also fixed its other FEMA TAC subcontractors' hourly rates by offering "pre-determined" wage rates with no bids or offers. In essence, Atkinson uniformly "hired" FEMA TAC subcontractors to perform work under Fluor's prime FEMA PA TAC IV contract through pre-determined, no-bid subcontracts (i.e., non-competitive subcontracts).

32. Upon information and belief, Fluor sets and dictates pre-determined and fixed hourly rates to be paid by Fluor to its roster of FEMA PA TAC IV approved subcontractors and to its roster of FEMA PA TAC V approved subcontractors, including Defendants, for FEMA PA TAC services (i.e., for each position leased to FEMA through their FEMA PA TAC subcontractors), which constitutes a *per se* violation of the Sherman Act and the Florida Antitrust Act.

33. Plaintiff's March 30, 2023 Subcontract Agreement for Services with Atkinson also includes a "Non-Disclosure" agreement under which Plaintiff was prohibited from discussing his compensation with anyone other than his spouse or immediate family, under threat of termination.

34. The aforementioned agreements and anti-competitive cooperation between Defendants were designed to keep FEMA TAC subcontractors' and employees' wages suppressed. As set forth herein, upon information and belief, all of the Defendants entered into mutual non-solicitation and anti-poaching agreements with the common interest and intention to keep their

FEMA TAC subcontractors' and employees' wage costs down, so that profits continued to rise or at least not be undercut by rising wages across the industry. As a result, Defendants engaged in unreasonable restraint of trade and anti-competitive behavior in advancement of a common and illegal goal of profiting at the expense of competitive market-based wages.

35. Defendants agreements unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. §§ 1, *et seq*., and the Florida Antitrust Act of 1980, Fla. Stat. §§ 542.15, *et. seq*. Plaintiff, on behalf of himself and on behalf of the Class defined herein, seeks to recover the difference between the wages that Class Members were paid by Defendants and what Class Members would have been paid in a competitive market, in the absence of Defendants' unlawful agreements, plus treble damages, attorneys fees and costs, and interest allowed under the law.

## V. <u>ADDITIONAL FACTS IN SUPPORT OF THE CONSPIRACY</u>

36. Additional FEMA TAC workers' experiences demonstrate how EMP and Fluor coordinated to restrict workers' movement to other employers.

37. Alejandro Casas ("Casas") worked for EMP as a Mitigation Specialist during a Florida deployment in 2024. EMP paid Casas $50 per hour. In approximately October 2024, Casas received a firm employment offer from Golden Homes LLC ("Golden Homes"). Golden Homes was working as a subcontractor of Dewberry. Golden Homes's CEO was Scott Goldsmith. Golden Homes offered Casas $35 per hour more than EMP paid him. Golden Homes had approved Casas's hiring and begun onboarding him. Golden Homes had also shipped Casas an iPad for project work.

38. Casas informed EMP's president, Paul Manno ("Manno"), that he had received the higher-paying employment offer. Manno became enraged. During their telephone conversation, he screamed at Casas and told him he was "dead to him." Manno threatened to have Casas "blackballed" from future FEMA deployments. Manno immediately reported Casas's attempt to

leave EMP to Fluor. Fluor then contacted Golden Homes and instructed it not to hire Casas, thereby enforcing the antirust conspiracy.

39. Within one hour, Golden Homes withdrew its employment offer to Casas and required him to return the iPad it had already shipped him. Casas contacted Eugene Greenberg ("Greenberg"), the Fluor manager responsible for interactions between Fluor and its subcontractors, and explained his situation. Greenberg told Casas that he had to contact and deal with Manno. To preserve his EMP employment and prevent further retaliation, Casas wrote an apology letter to Manno. EMP's and Fluor's intervention deprived Casas of the opportunity to earn $35 more per hour through Golden Homes.

40. Another FEMA TAC worker, Peter Arianas ("Arianas"), encountered the same restriction when he sought to move from EMP to A2K, Inc. ("A2K"), another subcontractor operating under Fluor's prime contract. Arianas worked for EMP in Fort Myers, Florida from May 2023 to June 2025 as a Program Delivery Manager ("PDMG"). Before he began working for EMP, Arianas was verbally told by Manno that he would be offered $70 per hour for his PDMG work. However, when he subsequently received a written employment offer from EMP, Arianas was only offered $55 per hour on a take-it-or-leave-it basis, with no ability to negotiate a higher compensation amount. In 2025, A2K told Arianas it could take him on only if EMP approved his departure and removed him from its roster under Fluor's prime contract. Arianas was not actively deployed for EMP when he sought to move to A2K, and Arianas understood that A2K would pay him more than he was receiving from EMP if he was able to switch from EMP to A2K. Nevertheless, after Arianas reached out to Fluor manager Eugene Greenberg regarding getting released from EMP's roster, Greenberg told Arianas that EMP had not released him and directed him to speak with EMP's representatives. EMP's Deployment Operations Manager, Stephanie

Duffy, expressly confirmed Fluor's enforcement of the restriction in an August 8, 2025 email to Arianas, stating: "I received a phone call from Fluor because they were notified you were going to other subs looking for work, which is not allowed." Arianas subsequently attempted to contact Greenberg but was never able to get back in contact with him. Fluor and EMP's actions, and specifically its enforcement of Fluor's anti-poach mandate, prevented Arianas from being able to secure FEMA TAC work with A2K or any other FEMA TAC subcontractor under Fluor's prime contract.

41. At all relevant times, Defendants agreed to prevent their workers from accepting competing FEMA TAC job offers at a better rate of pay. At all relevant times, Defendants took affirmative steps to prevent their workers from accepting competing job offers at a better rate of pay, including threatening their workers with being blackballed in the industry. At all relevant times, Defendants relied upon Fluor to enforce the no-poaching conspiracy and upon the other Defendants (and even companies that are not presently named as Defendants) to comply with Fluor's demands and its anti-poach mandate. Through its non-solicitation and anti-poach mandates, Flour controls its subcontractors, including the other named Defendants, and prevents the movement of personnel between subcontractors, controlling and preventing competition between the subcontractors.

## VI. HARM TO COMPETITION AND ANTITRUST INJURY

42. Defendants are each in the business of providing professional and technical services to the U.S. federal government agency FEMA, specifically in disaster recovery support. During the relevant time period, Fluor was a prime contractor to FEMA within Zone 1 of FEMA PA TAC IV (regions 1, 3, and 4) and within the East Zone of FEMA PA TAC V (regions 3 and 4), with an exclusive FEMA PA TAC contract for Connecticut, Maine, Massachusetts, New Hampshire,

Rhode Island, Vermont, Delaware, Maryland, Pennsylvania, Virginia, District of Columbia, West Virginia, Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee,[2] and the other named Defendants each (a) entered into contracts with Fluor to provide FEMA TAC services, and (b) hired FEMA TAC employees and/or entered into FEMA TAC services subcontracts with FEMA TAC subcontractors (i.e., Plaintiff and the Class Members). In order to complete the professional and technical services anticipated under Fluor's prime contracts with FEMA, Defendants depend on the labor of hundreds of FEMA TAC subcontractors and/or employees. FEMA PA TACs assist public entities (e.g., states, counties, etc.) after a disaster has occurred and are not used for emergency response or emergency protective measures.

43. The Class Members, i.e., Defendants' FEMA TAC subcontractors and/or employees within Zone 1 of FEMA PA TAC IV (regions 1, 3, and 4) and within the East Zone of FEMA PA TAC V (regions 3 and 4), consist of site inspectors, program delivery managers, environment and historic preservation inspectors, hazard mitigation inspectors, cost estimators, TAC-Coordinators, and others. The majority of personnel supplied to Fluor by its subcontractors are in four job positions: program delivery managers, site inspectors, hazard mitigation inspectors, and cost estimators. The Class Members frequently obtain formal specialized schooling and/or training for their job duties and then gain invaluable experience and skills specific to the industry throughout their careers. They typically work on disaster recovery support projects for discrete periods of time; such projects are often associated with a particular disaster.

[2] On information and belief, Fluor's prime contract with FEMA within Zone 1 of FEMA PA TAC IV spanned from approximately December 2017 through January 2024, and Fluor's prime contract with FEMA within the East Zone of FEMA PA TAC V began in or around January 2024. FEMA region 1 includes: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. FEMA region 3 includes: Delaware, Maryland, Pennsylvania, Virginia, District of Columbia, and West Virginia. FEMA region 4 includes: Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.

44. Notably, in January 2025, the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") issued "Antitrust Guidelines for Business Activities Affecting Workers."[3] These revised guidelines provide that antitrust laws, including no-poaching and wage-fixing agreements, apply to independent contractors. *See id.* at p. 10, Section 6 ("The antitrust laws prohibit anticompetitive conduct directed at workers, which includes both employees and independent contractors…. [A]n agreement between two or more competing [businesses] to fix the compensation of independent contractors offering their services . . . may constitute the type of *per se* violation of the antitrust laws that [] exposes the [businesses] to criminal liability.").

45. Unrestricted competition and the free market are the foundations of the American economic system, and antitrust laws protect competition for labor just as they protect competition for goods and services. Antitrust laws "protect the freedom of working people to choose the best job for them and their families. Just as vibrant competition for goods and services benefits consumers, competition among employers benefits workers through better wages, benefits, and other terms and conditions for working people. Business practices may violate the antitrust laws when they harm the competitive process, especially if they deprive labor markets of independent centers of decision making or they create or abuse employers' monopsony power. By interfering with free and fair competition for workers, such practices can lead to fewer job opportunities, lower wages, and worse working conditions." *Id.* at p. 1.

46. Upon information and belief, Defendants conspired to not actively solicit each other's FEMA TAC subcontractors and employees—and to not even consider employing or contracting with each other's rostered FEMA TAC subcontractors and employees even if those individuals actively pursued FEMA TAC opportunities with them—as part of one overarching

[3] Available at:
https://www.ftc.gov/system/files/ftc_gov/pdf/p251201antitrustguidelinesbusinessactivitiesaffectingworkers2025.pdf

conspiracy to suppress the compensation of their FEMA TAC subcontractors and employees. This anticompetitive conspiracy restricted the Class Members from finding employment opportunities even outside of the time periods when they were actively engaged in FEMA service work with a FEMA PA TAC IV or V approved subcontractor (i.e., Defendants). The desired effect was obtained. Defendants' conspiracy suppressed Plaintiff's and the Class's compensation and restricted competition in the labor markets in which Plaintiff and the other members of the Class sold their services. They did so through an overarching agreement concerning mutual non-solicitation and anti-poaching, and by fixing the wages of their FEMA TAC subcontractors and employees.

47. Concerning the non-solicitation agreements, the use of recruiters to place cold calls to competitors' workers or subcontractors, and other forms of active solicitation, have a significant beneficial impact for those individuals' compensation. As understood by Defendants, active recruitment by rival companies often include enticing offers that exceed a FEMA TAC subcontractor's or employee's current wages, thereby incentivizing the FEMA TAC subcontractor or employee to leave his or her current contract or employment when appropriate in order to receive higher wages or, alternatively, allowing the FEMA TAC subcontractor or employee to negotiate increased compensation from his or her current FEMA PA TAC IV or V approved subcontractor. FEMA TAC subcontractors or employees receiving cold calls and active solicitation offers often inform other subcontractors or employees of the offer(s) they received, spreading information about higher wage levels that can similarly lead to movement for the purposes of higher wages and/or negotiation by those other FEMA TAC subcontractors or employees with their current FEMA PA TAC IV or V approved subcontractor or others for higher wages.

48. Active solicitation similarly affects compensation practices by FEMA PA TAC IV and V subcontractors. A company that actively solicits competitors' FEMA TAC subcontractors or employees will learn whether their offered compensation is enough to attract their competitors' FEMA TAC subcontractors or employees, and may increase the offers to make their own company and its wages more competitive in the marketplace. Similarly, companies losing or at risk of losing FEMA TAC subcontractors or employees to competitors engaged in active recruitment of subcontractors or employees associated with their competitors may preemptively increase their FEMA TAC subcontractors' or employees' compensation in order to reduce their competitors' appeal.

49. These information exchanges, through which information about higher wages is exchanged between recruiters of one company and FEMA TAC subcontractors or employees of another, naturally tend to increase FEMA TAC subcontractor and employee compensation. The agreement between Defendants against active recruitment of each other's FEMA TAC subcontractors and employees made higher paying opportunities less transparent to them and thus allowed Defendants to keep wages lower than they would otherwise have been in the absence of such agreements.

50. The compensation effects of cold calling and active recruitment are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling and other active recruitment, pursuant to the mutual non-solicitation and anti-poaching agreements) commonly impact all Class Members.

51. Further, Fluor's action of pre-determining and fixing hourly rates for its FEMA PA TAC IV approved subcontractors and its FEMA PA TAC V approved subcontractors also

suppressed the Class Members' wages. If Fluor's FEMA PA TAC IV approved subcontractors and its FEMA PA TAC V approved subcontractors competitively bid upon FEMA TAC subcontract opportunities, those with the higher rates from Fluor could afford to pay higher wages to their FEMA TAC subcontractors and/or employees.

52. As described above, Defendants' efforts to maintain internal equity coupled with their non-solicitation and anti-poaching agreements ensured that their conspiracy caused the compensation of all their FEMA TAC subcontractors and/or employees to be suppressed. It also caused their conspiracy to be covert, well disguised, and not known except through active solicitation by FEMA TAC subcontractors or employees for better rates or wages and opportunities.

## VII. <u>INTERSTATE COMMERCE</u>

53. During the Class Period, Defendants contracted with or employed Plaintiff and other Class Members in Florida and numerous other states, including Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, Delaware, Maryland, Pennsylvania, Virginia, District of Columbia, West Virginia, Alabama, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.

54. Fluor's prime contracts with FEMA, i.e., PA TAC IV and PA TAC V, provided Fluor and the other Defendants (through their subcontracts with Fluor) with exclusive FEMA TAC service contracts in the aforementioned U.S. States and the District of Columbia.

55. Defendants, Plaintiff, and other Class Members view labor competition in the disaster recovery support industry to be nationwide. Defendants considered each other's wages to be competitively relevant regardless of location, and many Class Members travel between states to pursue employment and FEMA TAC service contract opportunities with Defendants.

56. Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## VIII. CLASS ACTION ALLEGATIONS

57. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P 23(b)(3) on behalf of a Class consisting of:

> All persons who worked as a subcontractor or employee for any of the Defendants to provide FEMA TAC services under or in relation to Defendant Fluor Federal Services, Inc.'s prime contract with FEMA within Zone 1 of FEMA PA TAC IV (regions 1, 3, and 4) and/or its prime contract with FEMA within the East Zone of FEMA PA TAC V (regions 3 and 4) at any time from four years prior to the filing of the Complaint through the conclusion of this action (the "Class Period").[4]

58. Plaintiff believes there are more than 700 current and former individuals in the Class. Given Defendants' systemic failure to comply with United States and Florida laws outlined in this Class Action Complaint, the members of the Class are so numerous that joinder of all members is impractical. The Class is ascertainable from Defendants' employment and hiring records, their FEMA TAC contractor and subcontractor records, or their FEMA TAC call down list(s).

59. Plaintiff's claims are typical of the claims of the members of the Class, because all Class Members are or were FEMA TAC subcontractors or employees who sustained damages arising out of Defendants' illegal mutual non-solicitation, anti-poach, and wage-fixing agreements, in violation of Section 1 of the Sherman Act and Section 542.18 of the Florida Antitrust Act, that resulted in wage suppression for all of the Class Members.

60. Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no conflict of interest with any member of the Class. Plaintiff has retained counsel competent and

[4] Plaintiff reserves the right to modify the class definition at a later date to conform to new facts learned, including the properly named entity Defendant(s).

experienced in complex class action litigation with the resources and expertise necessary to litigate this case through to conclusion.

61. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to Plaintiff and Class Members are:

a. Whether Defendants agreed to not actively recruit and/or enter FEMA TAC services contracts with each other's FEMA TAC subcontractors and employees in positions held by the Class Members;

b. Whether Defendants agreed to fix the wage ranges for the positions held by Class Members;

c. Whether the mutual non-solicitation, anti-poaching, and/or wage-fixing agreements between Defendants were per se violations of the Sherman Act and/or the Florida Antitrust Act;

d. Whether Defendants violated Section 1 of the Sherman Act by agreeing to not actively recruit or solicit one another's FEMA TAC subcontractors and employees in positions held by Class Members;

e. Whether Defendants violated Section 1 of the Sherman Act by agreeing to fix the wage ranges for the positions held by Class Members;

f. Whether Defendants violated Fla. Stat. §§ 542.18 et seq. by agreeing to not actively recruit or solicit one another's FEMA TAC subcontractors and employees in positions held by Class Members;

g. Whether Defendants violated Fla. Stat. §§ 542.18 et seq. by agreeing to fix the wage ranges for the positions held by Class Members;

h. Whether and the extent to which Defendants' conduct suppressed the Class Members' wages below competitive levels;

i. Whether Plaintiff and the other Class Members suffered injury as a result of Defendants' agreements;

j. Whether any such injury constitutes antitrust injury;

k. Whether Class Members are entitled to treble damages; and

l. The measure of damages suffered by Plaintiff and the Class.

62. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individuals would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class Members are readily identifiable from Defendants' employee rosters, payroll records, FEMA TAC contractor and subcontractor records, FEMA TAC call down list(s), or other company records.

63. Defendants' actions are generally applicable to the entire Class. Prosecution of separate actions by individual members of the Class creates the risk of inconsistent or varying adjudications of the issues presented herein which, in turn, would establish incompatible standards of conduct for Defendants.

64. Because joinder of all members is impractical, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, the amounts at stake for many members of the Class, while substantial, may not be sufficient to enable them to maintain separate suits against Defendants.

## IX. STATUTE OF LIMITATIONS AND DEFENDANTS' CONTINUING VIOLATION

65. Defendants' conspiracy was and is a continuing violation in which Defendants repeatedly invaded Plaintiff's and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreements described herein.

66. Before approximately mid-2022, Plaintiff and the members of the Class had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy until at the earliest mid-2022 when Plaintiff attempted to move from Atkinson to another Fluor FEMA contractor, and numerous Defendants—including iParametrics, BJMC, EMP, and Novaces—all informed him that they were under a specific anti-poach mandate by Fluor and that they could not speak with him. This case was filed within four years of when Plaintiff could have first became aware that Defendants had engaged in mutual non-solicitation and anti-poaching agreements, and wage-fixing agreements.

67. Defendants engaged in a conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among them to restrict competition for Class Members' FEMA TAC services through non-solicitation and anti-poaching agreements, and to fix the wages of Class Members. Further, upon information and belief, Defendants continue to engage in an illegal conspiracy through non-solicitation, anti-poaching, and wage-fixing agreements as to the Class Members, i.e., Defendants' FEMA TAC subcontractors and employees within Zone 1 of FEMA PA TAC IV (regions 1, 3, and 4) and Defendants' FEMA TAC subcontractors and employees within the East Zone of FEMA PA TAC V (regions 3 and 4).

## X. CAUSES OF ACTION

**COUNT I**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT**
**[15 U.S.C. § 1, *et seq*.]**

**(On Behalf of Plaintiff and the Class)**

68. Plaintiff incorporates by reference the allegations in the above paragraphs 1 through 70 as if fully set forth herein.

69. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1, *et seq*. Specifically, Defendants agreed to restrict competition for Class Members' FEMA TAC services through non-solicitation agreements, non-poaching agreements, and agreements to fix the wage ranges of Class Members, all with the purpose and effect of unreasonably suppressing Class Members' compensation and restraining competition in the market for Class Members' FEMA TAC services.

70. Defendants' conduct injured Plaintiff and the Class Members by lowering their compensation and depriving them of free and fair competition in the market for their FEMA TAC services.

71. Defendants' agreements are *per se* violations of the Sherman Act because their nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.

72. Plaintiff seeks the relief set forth below, including underpaid and treble damages.

**COUNT II**

**VIOLATION OF THE FLORIDA ANTITRUST ACT OF 1980**
**[Fla. Stat. §§ 542.15, *et seq.*]**

**(On Behalf of Plaintiff and the Class)**

73. Plaintiff incorporates by reference the allegations in the above paragraphs 1-70 as if fully set forth herein.

74. Fla. Stat. Section 542.18 prohibits contracts, combinations, or conspiracies in restraint of trade or commerce.

75. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of Fla. Stat. §§ 542.15, *et seq*. Specifically, Defendants agreed to restrict competition for Class Members' FEMA TAC services through non-solicitation agreements, non-poaching agreements, and agreements to fix the wage ranges of Class Members, all with the purpose and effect of suppressing Class Members' compensation and restraining competition in the market for Class Members' FEMA TAC services.

76. Defendants' conduct injured Plaintiff and the Class Members by lowering their compensation and depriving them of free and fair competition in the market for their FEMA TAC services, allowing Defendants to unlawfully retain money that otherwise would have been paid to Plaintiff and other Class Members.

77. Plaintiff and other Class Members are "persons" within the meaning of the Florida Antitrust Act as defined in Fla. Stat. § 542.17(5).

78. Defendants' agreements are *per se* violations of the Florida Antitrust Act because their nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.

79. Pursuant to Fla. Stat. § 542.22, any person who is injured by a violation of Fla. Stat. § 542.18 may bring a civil action to recover threefold the damages sustained, and the cost of suit, including a reasonable attorney's fee.

80. Plaintiff seeks the relief set forth below.

## XI. PRAYER FOR RELIEF

81. WHEREFORE, Plaintiff, on behalf of himself and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a. Certification of the class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

c. Compensatory damages in an amount to be proven at trial and trebled thereafter;

d. Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e. The costs of bringing this suit, including reasonable attorneys' fees and litigation costs;

f. An incentive award to compensate Plaintiff for his efforts in pursuit of this litigation; and

g. All other relief to which Plaintiff and the Class may be entitled at law or in equity.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated October 13, 2026.

Respectfully submitted,

By: */s/ Jonathan Pollard*
**Jonathan E. Pollard**
Fla. Bar No.: 83613
jpollard@pollardllc.com
**Christopher S. Prater**
Fla. Bar No.: 105488
cprater@pollardllc.com

**POLLARD PLLC**
401 E Las Olas Blvd., Ste. 1400
Fort Lauderdale, FL 33301-2218
Telephone: (954) 332-2380

**Craig J. Ackermann** (admitted *pro hac vice*)
cja@ackermanntilajef.com
**Brian Denlinger** (admitted *pro hac vice*)
bd@ackermanntilajef.com
**Avi Kreitenberg** (admitted *pro hac vice*)
ak@ackermanntilajef.com
**ACKERMANN & TILAJEF, P.C.**
315 S. Beverly Dr., Ste. #504
Beverly Hills, CA, 90212
Telephone: (310) 277-0614
Facsimile: (310) 277-0635
*Attorneys for Plaintiff and the Putative Class*